UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANTHONY ARMATULLO,                              :

                Petitioner,          :          04 Civ. 5357 (JSR) (GWG)

    -v.-                                        :          REPORT AND
                                                                   RECOMMENDATION
JUSTIN TAYLOR, Superintendent,                  :
Gouverneur Correctional Facility,
                                                :
                Respondent.
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Anthony Armatullo brings this petition pro se for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to set aside a judgment of conviction issued on September 6, 2001 in New York State Supreme Court, New York County. Following a bench trial, Armatullo was convicted of two counts of Attempted Assault in the Second Degree (New York Penal Law ("N.Y.P.L.") §§ 110.00, 120.05(2)), and one count each of Criminal Possession of a Weapon in the Fourth Degree (N.Y.P.L. § 265.01(2)), Petit Larceny (N.Y.P.L. § 155.25), and Criminal Possession of Stolen Property in the Fifth Degree (N.Y.P.L. § 165.40). He was sentenced to a term of two to four years on the attempted assault charges and one-year terms on each of the remaining charges, with all terms to run concurrently. Armatullo, who is also known as Anthony Cusamano and whose real name appears to be Michael Bonano, is currently incarcerated at the Clinton Correctional Facility in Dannemora, New York, pursuant to a subsequent judgment of conviction. For the reasons stated below, Armatullo's petition should be denied.

# I. BACKGROUND

At trial, Armatullo was represented by Marlene Vasquez and Tara Collins of the Legal Aid Society. The prosecution was conducted by Assistant District Attorney Therese Ballou.

## A. Evidence at Trial

On November 17, 2000, Armatullo entered a Duane Reade drugstore on Third Avenue between 115th and 116th Streets in Manhattan. (Campoverte: Tr. 60-61, 66-67; Valverde: Tr. 104-05).[1] Luis Campoverte, a plainclothes security officer at Duane Reade, saw Armatullo take ten boxes of Visine from a shelf and hide the boxes in his jacket. (Campoverte: Tr. 61, 64, 66-68, 86-87; Garcia: Tr. 151-52). After putting the Visine in his jacket, Armatullo attempted to leave Duane Reade without paying. (Campoverte: Tr. 68). Campoverte stopped Armatullo, identified himself, and took him to a room in the back of the store. (Campoverte: Tr. 68-69; Valverde: Tr. 112; Beltran: Tr. 176). Campoverte also informed Frank Valverde, the manager of Duane Reade, that he had just caught a shoplifter. (Valverde: Tr. 109, 112-13, 142). Valverde called Juan Garcia, a stockboy, to stand by the back room "just in case something happen[ed]." (Valverde: Tr. 112-13; accord Valverde: Tr. 135, 142; Garcia: Tr. 152-53). Campoverte searched Armatullo and recovered the Visine taken from the store shelf as well as a flathead screwdriver that was inside Armatullo's left sock. (Campoverte: Tr. 69, 71-72, 89-93, 102).[2] The screwdriver was then given to Valverde to put in his office. (Campoverte: Tr. 72; Valverde: Tr. 147; Garcia: Tr. 153-56).

---

[1]Citations to "Hearing: Tr." are to the record of pretrial proceedings. Citations to "Tr." are to the record of trial proceedings. Citations to "S." are to the sentencing minutes. See Trial Transcript, filed Feb. 28, 2005 (Docket #16).

[2]Campoverte initially testified that he pulled the tool from Armatullo's sleeve. (Campoverte: Tr. 69).

As Campoverte began filling out paperwork in connection with an arrest for shoplifting, Armatullo "started going crazy." (Campoverte: Tr. 72-73). He "start[ed] getting aggressive" and pulled out a tack claw (Campoverte: Tr. 73, 78) – a tool similar to a screwdriver but with two prongs instead of a blade at the tip. (See id.) Armatullo then raised the tack claw over his left shoulder and fled the room. (Campoverte: Tr. 73-75, 78-79; Garcia: Tr. 156-57).

While Campoverte and Armatullo were in the back room, Valverde was in his office watching the interactions on a camera and talking on the phone with the police. (Valverde: Tr. 113, 141-42). Valverde was getting up to get more film for one of the cameras in the store when he heard Armatullo yell, "I am not going back. I am not going back." (Valverde: Tr. 113).

Valverde went toward the back room and saw Armatullo run out carrying the tack claw and moving it in a "thrusting" motion. (Valverde: Tr. 113-14, 117-18). Armatullo was "a little frantic" and was "trying to evade [Garcia]" who was attempting to stop him by putting a hand truck in his way. (Valverde: Tr. 116; accord Valverde: Tr. 118; Garcia: Tr. 157-59). Armatullo managed to evade Garcia but Valverde stepped in his way, grabbed him, and threw him against the bathroom door. (Valverde: Tr. 118; Garcia: Tr. 160). Valverde attempted to put Armatullo in a headlock, but Armatullo slipped out of his grasp and both Valverde and Armatullo fell to the floor. (Valverde: Tr. 118-20). Valverde testified that as he fell, Armatullo stabbed him in the back with the tack claw. (Valverde: Tr. 118-20).

Garcia and a security guard, Joel Beltran, saw Armatullo attempt to stab Valverde. (Garcia: Tr. 160-62; Beltran: Tr. 178-80). Garcia came over to prevent the assault and Armatullo struck him on the hand and elsewhere on his arm and rib cage with the tack claw. (Valverde:

Tr. 120; Garcia: Tr. 160-61, 164, 166-68; Beltran: Tr. 178, 180-82). Garcia's left hand began to bleed as a result of a blow to his palm. (Campoverte: Tr. 80, 95; Garcia: Tr. 164-65).

Campoverte, Garcia, and Beltran ran after Armatullo, who had gotten up off the floor and was fleeing the store while still carrying the weapon he had brandished in the store. (Campoverte: Tr. 80-81, 95-96; Valverde: Tr. 120; Garcia: Tr. 165; Beltran: Tr. 183). The three employees eventually caught up to Armatullo, apprehended him, and detained him until police arrived. (Campoverte: Tr. 82-84).

Garcia's hand continued to bleed and he was treated by ambulance personnel. (Valverde: Tr. 122; Garcia: Tr. 166-68). Once he returned to Duane Reade, Valverde re-bandaged Garcia's hand in the back of the store pharmacy. (Campoverte: Tr. 85; Valverde: Tr. 122; Garcia: Tr. 166, 168). Garcia had a cut on the palm of his left hand, a scratch on the top of his hand, and a scratch on his ribs. (Valverde: Tr. 122-23; Garcia: Tr. 164-65, 167-68).

Armatullo did not testify at trial, although his grand jury testimony was submitted as evidence pursuant to a stipulation between the prosecutor and defense counsel. (Tr. 187-88). The testimony itself is not reproduced in the transcript, but is cited in the respondent's appellate brief, see Brief for Respondent, dated Apr. 22, 2003 (reproduced as Ex. C to Declaration in Opposition to a Petition for Habeas Corpus, filed Dec. 27, 2004 (Docket #9) ("Davis Decl.")) ("Resp. App. Br."), at 9-12, and Armatullo has attached selected pages of the grand jury transcript to his amended petition, see Grand Jury Testimony, dated Nov. 22, 2000 (annexed as Ex. 1E to Amended Petition, dated Aug. 5, 2004 ("Amended Petition")) ("GJ Tr."). In his testimony, Armatullo admitted that he entered Duane Reade with the intent to steal, but declared that he was unwilling to hurt anyone for the merchandise if he were stopped. Resp. App. Br. at 9.

Armatullo stated that Campoverte recovered the screwdriver, but not the tack claw, and admitted that when he realized that he was going to be arrested, he took out the tack claw and "'brandished it' over his shoulder in a 'threatening' way." Id. at 10 (quoting grand jury testimony). Armatullo also admitted to "'display[ing]'" the tack claw "in a threatening manner" as he fled the store, but denied ever swinging it at anyone or striking anyone with it. Id. at 10-11 (quoting grand jury testimony); accord GJ Tr. at 44, 61.

B. Verdict and Sentence

Armatullo was acquitted of assault in the second degree, but convicted of two counts of attempted assault in the second degree. (Tr. 222). Armatullo was convicted of all other counts in the indictment, including criminal possession of a weapon in the fourth degree, petit larceny, and criminal possession of stolen property in the fifth degree. (Tr. 222). He was sentenced to a term of two to four years on the felony assault charges and one-year terms for each of the misdemeanor charges, with all terms to run concurrently. (S. 10).

C. Direct Appeal

Armatullo appealed his conviction pro se to the Appellate Division, First Department, claiming that: (1) his trial counsel, Vasquez, was constitutionally ineffective; see Defendant-Appellant Appellate Brief, dated Oct. 17, 2002 (reproduced as Ex. B to Davis Decl.) ("Def. App. Br."), at 3, 5-46; (2) the trial judge, Justice Bruce Allen, denied him the right to appear pro se, id. at 3, 47; (3) the prosecutor failed to comply with her obligations under People v. Rosario, 9 N.Y.2d 286 (1961) and possibly Brady v. Maryland, 373 U.S. 83 (1963), id. at 3, 47-48; and (4) the prosecutor unlawfully amended the indictment during the trial, id. at 3, 48-49. The government opposed the appeal. See Resp. App. Br.

Armatullo subsequently submitted a reply brief asserting an additional claim that the judge who presided over his pretrial proceedings, Justice Carol Berkman, was biased against him. See Brief in Reply to Respondent's Brief, undated (reproduced as Ex. D to Davis Decl.), at 2, 46-50.[3] Armatullo asserted that he did not submit this claim in his initial brief because he did not have the full transcript of the pretrial proceedings until mid-December 2002. Id. at 2.

Armatullo's conviction was affirmed on June 12, 2003. People v. Armatullo, 306 A.D.2d 115 (1st Dep't 2003). The Appellate Division held that "assigned counsel provided effective assistance" and noted that Armatullo "did not make an unequivocal request to represent himself or establish good cause for appointment of new counsel." Id. (internal citations omitted). The court found Armatullo's other claims "unpreserved and . . . decline[d] to review them in the interest of justice." Id. The court added, "Were we to review these claims, we would reject them." Id.

On July 1, 2003, Armatullo filed a "Notice of Appeal to Court of Appeals, Pursuant to Article VI, § 3 of the New York Constitution: CPLR § 5513, § 5515, and § 5601(b)(1)," undated (reproduced as Ex. F to Davis Decl.) ("Notice of Appeal"), in the New York County Supreme Court. In that notice, Armatullo stated his intent to appeal "every part of the order of the [Appellate Division]," although he noted that "the main issue upon which I based my appeal to the Appellate Division, involves construction of both the state and federal constitutions: ineffective assistance of counsel." Id. Armatullo did not submit copies of his appellate brief with the Notice of Appeal.

---

[3] The last pages of the brief appear to be missing.

The Notice of Appeal was apparently forwarded to both the New York State Court of Appeals and the Appellate Division. The Court of Appeals denied leave to appeal, stating that "no civil appeal lies from the order entered in this criminal action." See Denial of Leave to Appeal, dated Sept. 9, 2003 (reproduced as Ex. H to Davis Decl.). The Appellate Division construed Armatullo's "Notice of Appeal" as a request for leave to appeal his criminal conviction to the Court of Appeals, however, and issued a denial of leave to appeal on November 7, 2003. See Certificate Denying Leave, dated Nov. 7, 2003 (reproduced as Ex. I to Davis Decl.).

Armatullo subsequently filed a "Notice of Motion: Seeking Certificate to Appeal to the New York Court of Appeals" with a supporting affidavit. See Leave to Appeal, dated Nov. 18, 2003 (reproduced as Ex. J to Davis Decl.). In the annexed affidavit, Armatullo requested leave to appeal on the basis of the five claims raised in his briefs to the Appellate Division. See Affidavit in Support of Motion Seeking Certificate Granting Leave to Appeal, dated Nov. 18, 2003, ¶ 5. Armatullo's request for leave to appeal was denied by the Court of Appeals on February 27, 2004. People v. Armatullo, 1 N.Y.3d 624 (2004).

_____D. The Instant Petition

Following the second denial of leave to appeal to the Court of Appeals, Armatullo filed the instant petition. See Petition for Writ of Habeas Corpus, filed July 9, 2004 (Docket #1) ("Petition"). In his petition, Armatullo sets forth essentially the five claims that he attempted to raise on direct appeal, namely: (1) ineffective assistance of counsel; (2) denial of right to proceed pro se by the trial judge; (3) failure of the prosecutor to provide Brady material; (4) the prosecutor's amendment of the indictment during trial; and (5) pretrial judicial bias. See Petition at 3, 5-6. On August 5, 2004, Armatullo submitted an "amended petition" discussing each of the

7

issues raised in the petition in greater detail. <u>See</u> Affidavit in Support of Amended Petition, dated Aug. 5, 2004 (annexed to Amended Petition and reproduced as Ex. R to Davis Decl.) ("Pet. Aff."); Memorandum of Law in Support of Amended Petition Seeking Writ of Habeas Corpus, dated Aug. 5, 2004 (annexed to Amended Petition and reproduced as Ex. S to Davis Decl.) ("Pet. Mem."). The respondent opposed Armatullo's petition. <u>See</u> Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed Dec. 27, 2004 (Docket #10).

On January 4, 2005, Armatullo moved to file an amended petition and an amended memorandum of law. <u>See</u> Notice of Motion Seeking Leave of Court to Amend Petition, dated Jan. 3, 2005; Affidavit in Support of Amended Filings, dated Jan. 3, 2005; Verified Petition in Support of Motion to Amend Petition, dated Dec. 20, 2004 (reproduced as Ex. A to Supplemental Declaration in Opposition to Petition for a Writ of Habeas Corpus, filed Feb. 28, 2005 (Docket #18) ("Supp. Decl.")). In the January motion, Armatullo sought to present a new claim of prosecutorial misconduct, <u>see</u> Memoranda of Law in Support of Motion to Amend Petition, undated (reproduced as Ex. A to Supp. Decl.) ("Prosecutorial Misconduct Br."), and to submit an amended memorandum of law in support of his judicial bias claim, <u>see</u> Amended Memoranda of Law in Support of Pretrial Judicial Bias Claim, dated Dec. 24, 2004 ("Judicial Bias Br.").

This Court granted Armatullo's motion to amend his petition. <u>See</u> Order, dated Jan. 10, 2005 (Docket #13). Before any response from the respondent relating to his second "amended petition" was filed, Armatullo submitted a traverse. <u>See</u> Petitioner's Traverse to Respondent's Memoranda of Law, dated Jan. 25, 2005 ("Traverse").

Following the receipt of Armatullo's amended petitions, memoranda of law, and traverse, the respondent filed an amended opposition to Armatullo's petition. <u>See</u> Respondent's Amended Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, filed Feb. 28, 2005 (Docket #17) ("Resp. Amend. Br.").

Armatullo has also submitted papers seeking discovery, including a request to take depositions and for an evidentiary hearing. <u>See</u> Notice of Petition Seeking Depositions, Discovery, and an Evidentiary Hearing, dated Feb. 6, 2005; Verified Petition in Support of Requests for Discovery, Oral Depositions and Evidentiary Hearing, dated Dec. 20, 2004 ("Discovery Pet."); Memoranda of Law in Support of Requests for Discovery, Depositions, and Evidentiary Hearing, dated Dec. 22, 2004 ("Discovery Mem."). Separately, he has submitted papers purporting to raise claims under 42 U.S.C. §§ 1983 and 1985, alleging that his appointed attorney, the prosecutor, and Justice Berkman conspired to deprive him of his right to a fair trial. <u>See</u> Declaration in Support of Motion to Accept and Review Legal Claim of Conspiracy, dated Jan. 18, 2005 ("1983 Brief").

II. <u>APPLICABLE LEGAL PRINCIPLES</u>

A. <u>Law Governing Petitions for Habeas Corpus Under 28 U.S.C. § 2254</u>

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims . . . with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (citation omitted). As long as "there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be "adjudicated on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. See Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001); accord Rosa v. McCray, 396 F.3d 210, 220 (2d Cir. 2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision.").

In Williams v. Taylor, the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405-06 (2000). Williams also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the state court's application must have been "objectively unreasonable." Id. at 409.

10

In addition, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Errors of state law are not subject to federal habeas review. See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). To be entitled to habeas relief, a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law. See, e.g., id. at 68.

B. Exhaustion

Before a federal court may consider the merits of a habeas claim, a petitioner is first required to exhaust his available state court remedies. See 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ."); accord Daye v. Attorney Gen. of N.Y., 696 F.2d 186, 190-91 (2d Cir. 1982) (en banc). To exhaust a habeas claim, a petitioner is required to have presented that claim to each available level of the state courts. See, e.g., Baldwin v. Reese, 541 U.S. 27, 29 (2004); see also O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (a habeas petitioner must "invoke[] one complete round of the State's established appellate review process"). The petitioner must also have fairly presented the federal nature of his claim to the state courts. See Baldwin, 541 U.S. at 29; Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam); Picard v. Connor, 404 U.S. 270, 275-76 (1971); Daye, 696 F.2d at 191. This requirement is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991).

C.  Procedural Default

        When a state court rejects a petitioner's claim because the petitioner failed to comply with

a state procedural rule, the procedural default normally constitutes an adequate and independent

ground for the state court decision.  See, e.g., Lambrix v. Singletary, 520 U.S. 518, 522-23 (1997);

Coleman, 501 U.S. at 729-30, 749-50.  A "procedural default will bar federal habeas review of the

federal claim, unless the habeas petitioner can show 'cause' for the default and 'prejudice

attributable thereto,' or demonstrate that failure to consider the federal claim will result in a

'fundamental miscarriage of justice.'"  Harris v. Reed, 489 U.S. 255, 262 (1989) (citations

omitted); accord Coleman, 501 U.S. at 749-50; Fama v. Comm'r of Corr. Servs., 235 F.3d 804,

809 (2d Cir. 2000); Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994); cert. denied, 514 U.S.

1054 (1995); see also Harris, 489 U.S. at 264 n.10 ("[A]s long as the state court explicitly invokes

a state procedural bar rule as a separate basis for decision," the adequate and independent state

ground doctrine "curtails reconsideration of the federal issue on federal habeas.").  To show a

"fundamental miscarriage of justice," a petitioner must demonstrate "actual innocence."  See, e.g.,

Calderon v. Thompson, 523 U.S. 538, 559 (1998); Dunham v. Travis, 313 F.3d 724, 730 (2d Cir.

2002).

III.  DISCUSSION

        Armatullo has raised the following issues: (1) ineffective assistance of counsel, (2) denial

of the right to proceed pro se at trial, (3) failure to provide Rosario or Brady material, (4) the

unlawful amendment of the indictment, (5) judicial bias by the pretrial judge, and (6)

prosecutorial misconduct.  See Petition at 3, 5-6; Pet. Aff. ¶¶ 9-168; Pet. Mem. at 8-35; Judicial

Bias Br.; Prosecutorial Misconduct Br.  We will discuss each of these claims in turn, followed by

a discussion of Armatullo's discovery requests and his assertion of claims pursuant to 42 U.S.C. §§ 1983 and 1985.

As an initial matter, however, the respondent asserts that there are a number of claims that are unexhausted and procedurally barred because Armatullo failed to raise them properly in his application for leave to appeal. See Resp. Amend. Br. at 9-12, 23, 26, 28, 33-34. We will not reach the exhaustion issue for many of these claims, however, as the habeas statute gives courts the option to deny any unexhausted claim on the merits. See 28 U.S.C. § 2254(b)(2). The one exception is the claim regarding prosecutorial misconduct, which is discussed in section III.F below.[4]

Finally, in some instances, Armatullo's voluminous papers might be liberally construed as raising claims that – while grounded in the trial court record – go beyond the scope of the claims he raised in his Appellate Division briefs. The case law is clear that if exhaustion of such a claim in the state courts is no longer possible, the claim is barred from habeas review. See, e.g., Bossett, 41 F.3d at 828-29. Thus, this Court has not addressed any new record-based claims raised in Armatullo's papers inasmuch as any such claims – including any record-based claims relating to ineffective assistance of counsel – are barred from habeas review absent a showing of cause and prejudice or actual innocence. See, e.g., Reed, 489 U.S. at 262; Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003). No such showing has been made here. Accordingly, we do not address any claims that do not appear in Armatullo's briefs to the Appellate Division.

---

[4]The respondent has also argued that some of the issues Armatullo raises are procedurally barred for reasons other than his failure to properly exhaust his claims. See Resp. Amend. Br. at 23-25, 28, 33-34. We will not reach this argument either because they raise complex issues of state law and the issues are more easily resolvable on the merits. See, e.g., Dunham, 313 F.3d at 729-30.

A.  Ineffective Assistance of Trial Counsel

Armatullo alleges that Vasquez's performance was "overwhelmingly deficient."  Pet.

Mem. at 8.  In support of his claim, Armatullo cites principally Vasquez's allegedly defective

omnibus motion, the failure to request that the screwdriver and tack claw be tested for the

presence of blood, and the failure to call, cross-examine, and impeach key witnesses.  See id. at 8-

19.

The guarantee of a criminal defendant's right to counsel under the Sixth Amendment is

also a guarantee of the effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668,

686 (1984) ("'[T]he right to counsel is the right to the effective assistance of counsel.'") (quoting

McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)).  As the Supreme Court explained in

Strickland, there are "two components" to making an ineffective assistance of counsel claim.

First, the defendant must show that his counsel's performance "fell below an objective standard of

reasonableness."  Id. at 687-88.  Next, the defendant must show that he was prejudiced by the

deficient performance of counsel.  Id. at 687.  This second prong "requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial."  Id.

In reviewing an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's

performance must be highly deferential."  Id. at 689.  Furthermore, where, as here, a petitioner is

challenging his attorney's strategic decisions, "a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action

'might be considered sound trial strategy.'"  Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101

(1955)).

The Appellate Division reviewed Armatullo's claim on the merits and determined that Vasquez provided Armatullo "effective assistance." Armatullo, 306 A.D.2d at 115. The question for this Court, therefore, is not whether the Appellate Division incorrectly applied Strickland to the facts of Armatullo's case, but only whether it applied Strickland "in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (per curiam); accord Eze v. Senkowski, 321 F.3d 110, 124-25 (2d Cir. 2003).

1. Defective Omnibus Motion

Armatullo claims that Vasquez's pretrial omnibus motion was filed late, contained "irrelevant" requests for the suppression of physical evidence, statements, and identification, and failed to request that the screwdriver and tack claw be examined for blood. Pet. Mem. at 8-9; Pet. Aff. ¶¶ 9, 12-14. As the claim that Vasquez's motion was untimely appears to have been raised for the first time in the instant petition, we do not address this argument for the reasons discussed above. In addition, no prejudice has been demonstrated resulting from the untimeliness. With respect to Armatullo's other criticisms, there is no reason to believe that Vasquez was constitutionally ineffective in preparing her omnibus motion.

First, accepting as true Armatullo's own characterization of Vasquez's suppression requests as "irrelevant," there is no basis for finding them prejudicial since Armatullo cannot logically argue that he was harmed by requests that had no effect on his case.

There is also no basis on which to disturb the Appellate Division's finding that Vasquez acted within the wide range of reasonable professional assistance when she did not request that

the tack claw and screwdriver be tested for the presence of blood.[5] Armatullo argues that if no blood were found on the tools, it would have proved that the assault never happened, not merely that the injuries sustained by Valverde and Garcia were insufficiently severe to sustain a legal charge of assault. Traverse at 10. In fact, the absence of blood on these items would not necessarily have constituted conclusive evidence that Armatullo did not inflict the injuries on Garcia and Valverde, even if it would have undermined Garcia's claims about the extent of his injuries. Moreover, counsel could reasonably have decided that a test result showing the presence of blood would have been so damaging to Armatullo's defense that it was not worth taking a chance to find out the answer to this question definitively. In any event, Armatullo was acquitted of assault and convicted only of attempted assault on Valverde and Garcia, and contrary to the suggestion in his Traverse, see id., the absence of blood on the tools would not necessarily have proved that he did not intend to assault the Duane Reade employees. Thus, Armatullo cannot show any prejudice from trial counsel not having conducted a test that may have shown the absence of blood.

---

[5]We refer to both the tack claw and the screwdriver because the witnesses testified inconsistently regarding the nature of the tool Armatullo pulled out when fleeing the back room. At trial, Campoverte, Valverde, and Garcia testified that the tool found on Armatullo's person was a screwdriver (Campoverte: Tr. 72, 89, 102; Valverde: Tr. 147; Garcia: Tr. 155-56), and that the tool used to threaten the employees was a tack claw (Campoverte: Tr. 73-77; Valverde: Tr. 117-18; Garcia: Tr. 154-57, 162-63; Beltran: Tr. 178-82). During his grand jury testimony, however, Campoverte testified that he recovered a tack claw from Armatullo. (See Campoverte: Tr. 89-92). Valverde testified before the grand jury that the tool recovered was a tack claw and the tool Armatullo subsequently pulled out was a regular screwdriver. (Valverde: Tr. 132-35). When asked at trial if they were sure that Campoverte recovered a regular screwdriver from Armatullo's sock and that Armatullo later brandished a tack claw, the witnesses stated that they were sure. (Campoverte: Tr. 101-02; Valverde: Tr. 147).

In sum, the failure to request testing of these items was not outside "the wide range of reasonable professional assistance" – and certainly the Appellate Division's decision on this point was not an unreasonable application of Supreme Court law.

This question must be decided adversely to Armatullo for a separate reason. Armatullo states that he "eliminated any possible prejudice by taking the initiative and . . . submitt[ing] his own omnibus." Traverse at 10-11. Armatullo's own omnibus motion apparently included a request to examine the tools, thus providing the pretrial judge with the opportunity to rule on whether the tools should be tested. Pet. Aff. ¶ 15; Pet. Mem. at 19; Traverse at 11. Thus, Armatullo was not prejudiced by any supposedly deficient representation by counsel and, indeed, now concedes that any prejudice was "eliminated" by the filing of his own motion. Traverse at 11.

### 2. Request for Psychiatric Examination

Responding to Armatullo's demands to represent himself, Vasquez requested that Judge Berkman order Armatullo to undergo a psychiatric evaluation pursuant to N.Y. Crim. Proc. Law § 730 ("730 exam"). (Feb. 7, 2001 Hearing: Tr. 2-3, 6-7). Following the initial exam – which revealed Armatullo's competence to stand trial – Vasquez requested additional 730 exams on two separate occasions, both of which were denied. See Pet. Mem. at 9; July 17, 2001 Hearing: Tr. 9-11; July 18, 2001 Hearing: Tr. 41-45. Armatullo characterizes Vasquez's requests that he be required to submit to psychiatric evaluations as a "scheme to thwart [his] self-representation." Pet. Mem. at 9. He argues that the mere request that he be examined constituted a "breach of loyalty" and a "conflict of interest" which was prejudicial per se and that having to submit to the exams delayed the trial proceedings. See Traverse at 11.

In a letter responding to charges that Armatullo made to a Departmental Disciplinary Committee, Vasquez explained that she requested the initial 730 exam because a series of decisions that Armatullo had made – including choosing to testify before the grand jury and rejecting a plea offer – had turned out badly for him and it appeared that Armatullo did not understand the consequences of going to trial. See Letter from Marlene Vasquez and Tara A. Collins to Orlando Reyes, Legal Assistant, Departmental Disciplinary Committee, dated June 14, 2002 (reproduced as Ex. K to Davis Decl.) ("Vasquez Letter"). Although Vasquez does not discuss the second and third requests for 730 exams, the requests were not granted and the requests alone could not have prejudiced Armatullo. Far from falling below the standard of competence, Vasquez's actions in requesting these examinations show diligence in pursuing the best interests of her client. Nor do her actions reflect either a breach of loyalty or a conflict of interest, and her performance has not been shown to have caused Armatullo any prejudice in mounting his defense. Armatullo also fails to point to any specific prejudice he suffered as a result of any delay alleged to have resulted from the need to conduct a 730 exam.

### 3. Effectiveness During Pretrial Proceedings

Armatullo objects to counsel's failure to make motions on his behalf or "otherwise benefit" him during the course of pretrial proceedings. Pet. Aff. ¶ 29. He notes that although Vasquez requested certain Rosario and/or potential Brady materials, she did not follow up on her requests after the prosecutor stated that the requested materials were not available. Id. ¶¶ 30-41, 106-16; Pet. Mem. at 20-21. Armatullo also characterizes Vasquez's Sandoval arguments as "woeful." Pet. Mem. at 9.

"[F]or purposes of effective assistance, not every possible motion need be filed, but rather, only those having a solid foundation."  United States v. Nersesian, 824 F.2d 1294, 1322 (2d Cir.) (citing United States v. Afflerbach, 754 F.2d 866, 870 (10th Cir. 1985)), cert. denied, 484 U.S. 958 (1987).  With respect to Armatullo's contentions that Vasquez did not adequately pursue pretrial motions or make unspecified applications on his behalf, see Pet. Aff. ¶ 29, Armatullo fails to identify what claims Vasquez should have pursued but did not.  Moreover, to the extent that this claim rests on what was missing from Vasquez's omnibus motion, Armatullo filed his own omnibus motion which he declares compensated for any of Vasquez's deficiencies.  See Traverse at 10-11.  Armatullo also submitted other pretrial motions on his own behalf during the period he was permitted to proceed pro se.  Pet. Aff. ¶ 26.  Because Armatullo has neither suggested what motions Vasquez failed to make nor shown any prejudice resulting from the failure to make them, he has not shown that Vasquez was ineffective on this ground.

With respect to the Rosario/Brady materials, Armatullo alleges that Vasquez initially objected to not being provided with a copy of the medical report created by the ambulance personnel who treated Garcia, the letter purportedly describing the prosecutor's attempt to find that medical report, and an attachment to a "Worker's Injury Report" which showed that Garcia only missed one day of work, but that she failed to follow up on any of these requests when the prosecutor failed to provide these documents.  See Pet. Aff. ¶¶ 30-35, 40-41, 106-16.  He also notes that Vasquez initially argued that surveillance cameras in Duane Reade may have captured the incident on tape, but he faults her for relying on the prosecutor's assurances that Valverde had turned over all of the surveillance tapes from Duane Reade that he had in his possession, which apparently did not show the incident.  See id. ¶¶ 36-39.  For reasons discussed in section III.C

below, Armatullo's <u>Brady</u> claim fails on the merits. As to the ineffective assistance claim, the only materials that could conceivably have contained <u>Rosario</u> or <u>Brady</u> material were the medical report, the attachment to the Worker's Injury Report, and the surveillance tapes. But there is no evidence that these documents or the tape ever existed or were in the prosecutor's possession at any time. (<u>See</u> Tr. 4-9, 13-14). Moreover, the prosecutor stated on the record that she would turn over the information if she had it. (Tr. 5, 13-14). Based on this record, Vasquez cannot be faulted for not having pressed the claim that the prosecutor was withholding <u>Rosario</u> or <u>Brady</u> material.

Armatullo's complaint about Vasquez's performance during the <u>Sandoval</u> hearing is also without merit. <u>See</u> Pet. Mem. at 9, 14; Pet. Aff. ¶ 44. Under the authority of <u>People v. Sandoval</u>, 34 N.Y.2d 371 (1974), a judge may rule in advance of trial on the extent to which a prosecutor may impeach a defendant who chooses to testify by introducing evidence of prior crimes or other bad acts. Of course, Armatullo lacks standing to attack the <u>Sandoval</u> ruling itself because he did not testify at trial. <u>See</u>, <u>e.g.</u>, <u>McEachin v. Ross</u>, 951 F. Supp. 478, 481 (S.D.N.Y. 1997) ("[A] habeas petitioner's failure to testify at trial is 'fatal to any claims arising out of a <u>Sandoval</u> type ruling' [because] absent such testimony, a court has no 'adequate non-speculative basis upon which to assess the merits of that claim.'") (quoting <u>Peterson v. LeFevre</u>, 753 F. Supp. 518, 521 (S.D.N.Y. 1991)). Following this logic, this Court arguably has no "non-speculative basis" on which to conclude that Armatullo was prejudiced by his attorney's performance.

In any event, Vasquez's performance was not ineffective. Armatullo's record contained numerous convictions for, <u>inter alia</u>, attempted burglary, petit larceny, and theft of services. (Tr. 19). The prosecutor asked for permission to inquire into all of Armatullo's past crimes. (Tr. 18-20). While Vasquez properly conceded that it would be unfair for the prosecution not to

20

be able to elicit testimony about any of his previous crimes, she appropriately argued that admitting all of them would be prejudicial, that some of the petit larceny convictions should be eliminated, that the jury should not learn that he had a conviction for a violent felony, and that it would be hard for the jury to credit Armatullo if it learned of the fact that he had used 27 aliases. (Tr. 22-23). In the end, Justice Allen ruled that the prosecutor could ask whether Armatullo had been "convicted of one felony, and more than a dozen misdemeanors in the last ten years" but would not permit her to inquire into the particular crimes or the facts underlying them if Armatullo answered in the affirmative. (Tr. 23-24). Justice Allen also refused to permit her to introduce evidence of the numerous aliases and social security numbers that Armatullo had used in the past. (Tr. 24). Given this relatively favorable result, counsel's performance was certainly not ineffective. Finally, Armatullo concedes that any prejudice stemming from Vasquez's "inept" arguments was "eliminated" by the fact that he waived his right to a jury trial. Traverse at 11.

      4. <u>Trial Strategy</u>

      Armatullo criticizes Vasquez's trial strategy, arguing that he was prejudiced by her theories for his defense, her waiver of an opening statement, her failure to effectively cross-examine the prosecution's witnesses, and her refusal to call appropriate witnesses on his behalf. <u>See</u> Pet. Aff. ¶¶ 57-93; Pet. Mem. at 15-18. He also complains of Vasquez's failure to object to the prosecutor's purported efforts to constructively amend the indictment. <u>See</u> Pet. Aff. ¶¶ 47-55, 60-61, 65, 68, 74; Pet. Mem. at 16. On this claim, as on others, Armatullo fails to cite any evidence that would permit this Court to overcome the deference due a trial attorney's strategic choices, much less the deference due the Appellate Division's judgment that Vasquez was not ineffective. Each allegation is discussed below.

a. Theories of defense

Armatullo argues that Vasquez's strategy for presenting his defense undermined his claim of innocence.  Pet. Aff. ¶¶ 85-88; Pet. Mem. at 14-16.  Specifically, Armatullo claims that Vasquez's theories that he either lacked the intent to assault the Duane Reade employees or that he acted in self-defense were mutually exclusive and undermined his assertions of innocence, and he notes that Vasquez conceded in her summation that Garcia had been injured.  See Pet. Aff. ¶¶ 85, 87-88; Pet. Mem. at 15-16.

Vasquez describes her defense strategy as "two-fold."  See Vasquez Letter.  Specifically, she set out to show (1) that there was insufficient evidence of a physical injury to support a charge of assault and (2) that Armatullo did not intend to injure anyone.  Id.  At the close of trial, Vasquez successfully moved the court to consider lesser included charges of attempted assault and reckless assault and asked the court to consider a self-defense justification based on Valverde's initial capture of Armatullo, during which he threw Armatullo against a wall and tried to put him in a headlock.  (Tr. 188-97).  In light of the evidence presented, Vasquez's strategy with respect to Armatullo's defense was not objectively unreasonable and was, in fact, ultimately successful in showing that Armatullo did not commit assault.

Vasquez's statements during summation that Garcia was cut by Armatullo, (see Tr. 202-03), were also not unreasonable.  There was substantial evidence establishing that Armatullo did, in fact, strike Garcia, including the testimony of all of the witnesses and the report of a police officer.  Rather than attempt to disprove that Garcia was cut, Vasquez focused on the prosecution's failure to prove that Garcia suffered a "physical injury" under the assault statute.

(See Tr. 198-201, 206-07). Thus, her summation was consistent with her trial strategy, which was not objectively unreasonable.

                b.  Opening statement

"[T]he decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel." Nersesian, 824 F.2d at 1321 (citing cases). In the instant case, there is no reason to conclude that Vasquez's decision to forgo making an opening statement was not part of a sound trial strategy, especially as her closing arguments sufficiently summed up the evidence in favor of her client and addressed the weaknesses of the prosecution's case. See, e.g., Carbajal v. United States, 2004 WL 2283658, at *7 (S.D.N.Y. Oct. 8, 2004) (no ineffective assistance of counsel where lawyer waived opening statement but conducted adequate cross examination, called a witness on his client's behalf, and gave a "forceful" summation); Reese v. Greiner, 2003 WL 21459577, at *5 (S.D.N.Y. June 23, 2003) (attorney's representation conscientious where he was able to have many of defendant's prior arrests and convictions excluded, conducted effective cross-examination, and suggested alternative theories of causation even if he made no opening statement). The choice was all the more reasonable because the trial was not before a jury but rather before a judge who, as an experienced finder of fact, would understand why the defense would choose not to make such a statement.

                c.  Examination of witnesses

Armatullo objects to Vasquez's failure to cross-examine Garcia and Beltran, complains that she did not effectively cross-examine other witnesses, and argues that she failed to call certain

witnesses who would be helpful, such as the medical personnel who initially treated Garcia and the police officer who arrested Armatullo. See Pet. Mem. at 13-14, 18; Pet. Aff. ¶¶ 58-76, 79-84.

"Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." Nersesian, 824 F.2d at 1321 (not ineffective for counsel to refuse to cross-examine where "little need for additional probing" and further cross-examination could have been counterproductive) (citing United States v. Bari, 750 F.2d 1169, 1182 (2d Cir. 1984)); accord Eze v. Senkowski, 321 F.3d 110, 126 (2d Cir. 2003), see also United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."), cert. denied, 526 U.S. 1164 (1999).

As Vasquez explains, she chose not to cross-examine Garcia because his direct testimony did not support a finding of a physical injury under New York law. See Vasquez Letter. Thus, Vasquez argued at length in her summation that the "physical injury" component of the assault statute had not been proven. (Tr. 198-201, 206-07). Vasquez states that she did not examine Beltran because it would not allow her to make certain arguments in summation regarding his inability to see the interactions between Armatullo and the store personnel. See Vasquez Letter. Vasquez made precisely that argument in her summation. (Tr. 202-03, 206). These decisions were certainly a reasonable exercise of judgment. While there were inconsistencies in these witnesses' statements, they were by no means as numerous and material as Armatullo suggests, see Traverse at 11, and there is no reason to believe the verdict would have been any different even if Vasquez had conducted cross-examination exactly as Armatullo wished her to.

Armatullo also cites Vasquez's failure to interview or call to the stand the arresting officer who wrote a report noting that Garcia's right forearm was injured, not his left, and the ambulance attendant who treated Garcia's injury. Pet. Aff. ¶¶ 79-84; Pet. Mem. at 10. Vasquez decided not to call such witnesses because they "were not relevant to any material issue of the case, nor could they provide any information pertinent to our defensive theories." See Vasquez Letter. The decision not to call such witnesses was consistent with Vasquez's strategy to show that the state had failed to prove the "physical injury" requirement, that Armatullo had not intended to cause any injury, and/or that he had been justified in doing so. Given that the testimony of these witnesses was not necessary at trial to support Armatullo's defense, it was not unreasonable for Vasquez to choose not to interview them. In any event, Armatullo was not prejudiced by the failure to produce this evidence since he was not convicted of assault.

5. Failure to Object to the Constructive Amendment of the Indictment

Armatullo states that Vasquez's "most egregious error" was her failure to object to the prosecutor's introduction of evidence that he used a tack claw to attack store employee, while the indictment referred to the use of a screwdriver. See Pet. Mem. at 16. He alleges that this resulted in the "constructive amendment" of the indictment. See id. at 16-17.

As described further below, Armatullo has made the argument that the "constructive amendment" claim constitutes an independent basis for habeas relief. For reasons discussed in section III.D, we conclude that the claim does not implicate federal constitutional law. Nonetheless, "the Sixth Amendment right to the effective assistance of counsel can be violated if counsel failed to raise a significant and obvious state law claim." LanFranco v. Murray, 313 F.3d 112, 118 (2d Cir. 2002) (citing Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)). Thus, we

address here whether counsel was ineffective for failing to raise the claim under state law.

Under New York law, a trial court may "permit the amendment of an indictment at any time before or during trial with respect to defects, errors, or variances from the proof relating to matters of form, time, place, names of persons and the like, provided that the proposed amendment does not change the theory of the prosecution or otherwise serve to prejudice the defendant on the merits." People v. Hood, 194 A.D.2d 556, 557 (2d Dep't 1993) (citation omitted). However, where "the indictment specifies a set of facts supporting a material element of the crime charged, the People at trial are [not] at liberty to present evidence that affirmatively disproves it." People v. Grega, 72 N.Y.2d 489, 497 (1988).

Armatullo contends that the indictment was unlawfully amended because it referred to him as having assaulted Garcia and Valverde with a screwdriver, see Indictment, undated (reproduced as Ex. 1W to Amended Petition), while the prosecutor proved at trial that Armatullo used a tack claw. See Pet. Aff. ¶¶ 47-56; Pet. Mem. at 16. Evidence that Armatullo used a tack claw rather than a screwdriver, however, did not constitute a change in the prosecution's "theory" of the case. Nor did it prejudice Armatullo. After all, Armatullo himself testified before the grand jury that he used a tack claw to try to escape the store. See Resp. App. Br. at 10-11; GJ Tr. at 44, 60-61. He also provided a sketch of the tack claw to his attorneys, who in turn provided it to the prosecution. Pet. Aff. ¶¶ 28, 98-99. Given the similarities in appearance between a tack claw and a screwdriver, the defense obviously expected that the central issue with respect to the assault charge was what Armatullo did with the tool he still had in his possession as he tried to flee the store, not which particular type of tool he had. There is simply no basis for Armatullo to complain that the prosecutor's evidence changed the theory of the case against him.

Armatullo's alternative argument that the substitution of the tack claw for the screwdriver as the dangerous instrumentality constitutes a prejudicial "variance," Pet. Mem. at 27; Traverse at 12, fails on the merits for the same reasons as his unlawful amendment of the indictment claim. "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." <u>Dunn v. United States</u>, 442 U.S. 100, 105 (1979) (citing <u>Berger v. United States</u>, 295 U.S. 78 (1935)). To challenge a conviction because of a variance, a petitioner does not have to show that the variance broadened the basis of conviction, but must show "substantial prejudice." <u>United States v. LaSpina</u>, 299 F.3d 165, 183 (2d Cir. 2002) (citing <u>United States v. McDermott</u>, 918 F.2d 319, 326 (2d Cir. 1990)). A variance is immaterial – and hence not prejudicial – "'where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'" <u>Id.</u> (quoting <u>United States v. Mucciante</u>, 21 F.3d 1228, 1236 (2d Cir. 1994)). For the reasons already stated, there was "substantial correspondence" between the indictment and the proof adduced at trial, and Armatullo was not misled by the allegations in the indictment.

Accordingly, there was no error in Vasquez's failure to object to the prosecution's presentation of proof at trial.

### 6. Conclusion

In sum, the Appellate Division's decision was neither contrary to nor an unreasonable application of <u>Strickland</u>.

### B. Denial of Right to Proceed *Pro Se*

Armatullo alleges that he was denied the constitutional right to proceed <u>pro se</u> during his

trial by Justice Allen.  See Pet. Mem. at 32-34.

As discussed above, Armatullo was dissatisfied with Vasquez's representation.  Armatullo initially presented a request to proceed pro se to Justice Berkman at a hearing on February 7, 2001.  (See Feb. 7, 2001 Hearing: Tr. 2-7).  At this hearing, Justice Berkman told him that she would only consider his request after a 730 examination.  (See Feb. 7, 2001 Hearing: Tr. 6-7).  At the subsequent pretrial hearing, Armatullo reaffirmed his desire to proceed on his own behalf. (Mar. 28, 2001 Hearing: Tr. 2-3).  Justice Berkman went through the charges against him and explicitly warned him about the dangers of proceeding without counsel, but ultimately granted his request.  (Mar. 28, 2001 Hearing: Tr. 4-10).

Armatullo proceeded pro se for some period of time, but on April 25, 2001, Justice Berkman reappointed counsel after she determined that Armatullo was incapable of following her instructions during court conferences.  See Pet. App. Br. at 47; (see also May 23, 2001 Hearing: Tr. 3) ("I tried time and time and time again, and you repeatedly would not follow simple directions. . . . [Y]ou won't let me get from one end of a court procedure to another.  I am not doing that anymore.  I have no obligation to do that.").  On May 23, 2001, Armatullo again attempted to have his attorney removed, but Justice Berkman denied his request.  (May 23, 2001 Hearing: Tr. 3).

Armatullo raised the issue again on July 18, 2001, at the start of his trial before Justice Allen.[6]  He began by asserting that he wished to be "assigned counsel" – apparently meaning that he wanted different counsel.  (Tr. 15).  He told Justice Allen that he was dissatisfied with Vasquez

_____

[6]The cover page of the trial transcript erroneously refers to the year of the trial as "2000" instead of "2001."

because she "repeatedly hindered" his defense. (Tr. 16). He stated that he sought "reappointment of counsel or possibly [a] two week adjournment so [he] could speak to any counsel, perhaps to [his] family," and then reiterated "once again, that [he] be given counsel, at least given two weeks adjournment to seek counsel." (Tr. 15-16). Armatullo also asked if Justice Allen would "consider appointing [him] as co-counsel" so that he could "have at least direct input when it comes to making summations and [so forth]." (Tr. 16). The following colloquy then took place:

> The Court: I think you made that application in front of Judge Berkman, did you not?
> Defendant: Yes.
> The Court: The application to proceed as your own lawyer?
> Defendant: Yes.
> The Court: I believe Judge Berkman rulled [sic] against you and rulled [sic] that you would proceed with counsel.
> Defendant: I ask – I was given the opportunity to proceed pro se and that was in effect quite awhile. Then there came a point where she appointed co-counsel, rather than simply having an attorney as an advisor. She named Miss Vasquez co-counsel. I'm asking that that be consider restating [sic] that since we are at trial I have no – I would like direct input.
> The Court: You can have direct input, but Miss Vasquez will remain your attorney.

(Tr. 16-17).

There are two separate events here that must be considered: (1) Justice Berkman's decision to revoke Armatullo's <u>pro se</u> status and appoint him counsel, and (2) Justice Allen's decision to keep Vasquez on the case as Armatullo's counsel on the first day of trial.

In the Appellate Division, Armatullo argued that "Judge Allen's failure to conduct any direct inquiry into the substance of the complaints against Ms. [V]asquez, . . . summarily dismissing them and firmly establishing her as 'defense' counsel, violated my VIth Amendment rights to effective assistance of counsel." Pet. App. Br. at 47. Armatullo also mentions Justice Berkman's decision to reinstate Vasquez as his attorney several times, <u>see</u> Pet. App. Br. at 3, 18-

19, even referring to this action as "stripp[ing]" him of the right to proceed <u>pro se</u> twice, <u>id.</u> at 18-19. Despite this reference to his "right" to represent himself, however, it is clear that Armatullo did not raise as a ground for relief Justice Berkman's decision to revoke his <u>pro se</u> status. Unlike his claim regarding Justice Allen's actions, which is addressed in its own section, <u>see</u> Pet. App. Br. at 47, Armatullo refers to Justice Berkman's action only in passing and in the context of other claims. The prosecution did not address this point in its opposition papers. Nor do any of Armatullo's subsequent papers suggest that he intended to make this particular claim on direct appeal. Moreover, the Appellate Division does not appear to have considered this argument, noting only that Armatullo "did not make an unequivocal request to represent himself or establish good cause for appointment of new counsel," making no mention of the prior revocation of this right. <u>Armatullo</u>, 306 A.D.2d at 115. Accordingly, insofar as the statement that Justice Berkman's "actions, rulings, and omissions violated [his] rights to . . . assistance of counsel (and the concurrent right to waive counsel)," Pet. Mem. at 32, can be read to suggest that Justice Berkman violated Armatullo's right to proceed <u>pro se</u> by reinstating Vasquez as counsel, the claim is now procedurally barred.

Thus, the remaining question before this Court is the propriety of Justice Allen's decision not to <u>reconsider</u> Justice Berkman's prior decision denying Armatullo's request to proceed <u>pro se</u>. As an initial matter, there is no question that such a denial is constitutionally permitted. While a defendant's right to self-representation in criminal proceedings is protected by the Sixth Amendment, <u>see</u> <u>Faretta v. California</u>, 422 U.S. 806 (1975), the defendant must still be "able and willing to abide by rules of procedure and courtroom protocol." <u>McKaskle v. Wiggins</u>, 465 U.S.

168, 173 (1984).  As the transcripts reflect, Justice Berkman concluded that Armatullo was unable to abide by courtroom rules and protocol.

Accordingly, the only question before this Court is whether Justice Allen committed constitutional error when he failed to reconsider that ruling based on the presentation made by Armatullo on the first day of trial.  The Appellate Division concluded that Armatullo's statements to Justice Allen were insufficient to constitute a clear and unequivocal request for self-representation.  See Armatullo, 306 A.D.2d at 115.  That argument certainly has force, given that Armatullo began the colloquy by seeking a change in counsel and ended by a request for permission to have "direct input" in his defense.  This is far from showing a "'purposeful choice reflecting an unequivocal intent to forego [sic] the assistance of counsel.'"  Wilson v. Walker, 204 F.3d 33, 38 (2d Cir.) (per curiam) (quoting Williams v. Bartlett, 44 F.3d 95, 100 (2d Cir. 1994)), cert. denied, 531 U.S. 892 (2000).[7]

It is unnecessary, however, to determine whether Armatullo made an unequivocal request for representation before Justice Allen.  What is dispositive is that, once Armatullo had already been determined to be ineligible for self-representation, nothing occurred at the July 18

---

[7]The requirement that a criminal defendant's request be "unequivocal" is based on two considerations.

> First, unless the request is unambiguous and unequivocal, a convicted defendant could have a colorable Sixth Amendment appeal regardless of how the trial judge rules: if his request is denied, he will assert the denial of his right to self-representation; if it is granted, he will assert the denial of his right to counsel. Second, the requirement of an unambiguous and unequivocal request inhibits any deliberate plot to manipulate the court by alternatively requesting, then waiving counsel.

Williams, 44 F.3d at 100-01 (internal citations and quotation marks omitted).

conference that required Justice Allen to conclude that Armatullo was suddenly "able and willing to abide by rules of procedure and courtroom protocol." McKaskle, 465 U.S. at 173. Certainly, Armatullo can point to no clearly established Supreme Court law that would have required reconsideration of his status at this point. Accordingly, habeas relief is not available on this ground.

   C. Failure of Prosecutor to Provide *Brady* Material

   Under the Brady doctrine, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." Brady, 373 U.S. at 87. Armatullo states that he made an omnibus motion prior to trial which contained requests for (1) medical reports related to Garcia's injury, (2) Garcia's attendance records, and (3) scientific examination of the screwdriver and tack claw for the presence of blood. Pet. Mem. at 19.[8] Armatullo asserts that the material he sought would have contradicted the witnesses' grand jury testimony concerning Garcia's injury and would have demonstrated his innocence. See id. at 19-25. The prosecutor turned over some Brady/Rosario material prior to trial, but did not turn over the items Armatullo mentions. See id. at 20.

   A "true Brady violation" has three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). The problem with Armatullo's argument is that he has provided no evidence that any of the items he requested actually exist.

_____

   [8]Armatullo also requested the surveillance footage taken by the security cameras in Duane Reade but notes that he is no longer seeking this material. Pet. Mem. at 19.

The trial transcript suggests that no EMS report was ever made. (See Tr. 3-7). The prosecutor stated that she turned over all of the portions of the worker's compensation report that she had received, and that in any case, if an attachment to the compensation report was not turned over, it was not in the prosecution's possession. (See Tr. 13-14). Nor is there any evidence that the prosecution ever conducted a scientific examination of the screwdriver and tack claw for the presence of blood. Without any showing that such evidence existed, Armatullo has no basis to claim that the government was responsible for withholding it. See, e.g., Ross v. McCoy, 2001 WL 30451, at *5 (S.D.N.Y. Jan. 10, 2001) ("The state is under no obligation to produce evidence that did not exist."). Thus, Armatullo's Brady claim must fail.

### D. Amendment of the Indictment

Armatullo argues that the prosecutor unlawfully amended the indictment after the trial began. Specifically, he asserts that the indictment charged that the "dangerous instrument" used in the assault was a screwdriver, that at least two witnesses at the grand jury testified that the instrument involved in the assault was a screwdriver, but that all the witnesses at trial testified that Garcia was stabbed with a tack claw. Pet. Mem. at 25-27. As a result, Armatullo claims that he the indictment was constructively amended. Id. at 26-27.

The Fifth Amendment guarantee of the right to a grand jury indictment does not apply to state court proceedings as the right has not been incorporated through the Fourteenth Amendment. LanFranco, 313 F.3d at 118 (citing cases). Accordingly, "any alleged impropriety in the amendment of the indictment is predicated on state law, and therefore is beyond [a habeas] Court's review." Staley v. Greiner, 2003 WL 470568, at *11 (S.D.N.Y. Feb. 6, 2003) (Report and Recommendation), adopted by Order, filed Mar. 17, 2003 (Docket #16 in 01 Civ. 6165) (quoting

Rodriguez v. Senkowski, 1995 WL 347024, at *2 (E.D.N.Y. May 31, 1995)). Nonetheless, there

is a due process right "that the accused be informed of the charges against him, so that he may

present his defense without being taken by surprise by evidence offered at trial." United States ex

rel. Richards v. Bartlett, 1993 WL 372267, at *4 (E.D.N.Y. Sept. 9, 1993) (citing Berger v. United

States, 295 U.S. 78, 82 (1935)); cf. Cole v. State of Ark., 333 U.S. 196, 201 (1948) ("No principle

of procedural due process is more clearly established than that notice of the specific charge, and a

chance to be heard in a trial of the issues raised by that charge, . . . are among the constitutional

rights of every accused in a criminal proceeding in all courts, state or federal.") (citing In re

Oliver, 333 U.S. 257 (1948)); accord LanFranco, 313 F.3d at 119 (the Due Process clause

guarantees "[a] defendant . . . fair notice of the charges against him); Chandler v. Moscicki, 253 F.

Supp. 2d 478, 486-87 (W.D.N.Y. 2003) (same). As already discussed with respect to New York

State law, see section III.A.5 above, the indictment in fact provided Armatullo fair notice of the

charges against him. Thus, Armatullo has not shown the violation of any federal constitutional

principle.

     E.  Pretrial Judicial Bias

Armatullo claims that Justice Berkman, who presided over his pretrial proceedings, was

impermissibly biased against him. As one example of Justice Berkman's alleged bias, Armatullo

cites the 730 exam that Justice Berkman ordered, ostensibly to prohibit him from proceeding pro

se. Pet. Mem. at 29. Armatullo also declares that Justice Berkman "viewed [him] negatively, and

dealt with [him] harshly," denying his motions "summarily," mocking his applications, and

throwing him out of court on one occasion. Id. at 31. In particular, Armatullo cites the denial of

his motion to have the screwdriver and tack claw tested for blood and Justice Berkman not ruling on his request for the report as examples of her judicial bias.  Id.

The Due Process clause, at a minimum, "requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (internal citation and quotation marks omitted). Notably, "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has 'a deep-seated favoritism or antagonism that would make fair judgment impossible.'" United States v. Diaz, 176 F.3d 52, 112 (2d Cir. 1999) (quoting Liteky v. United States, 510 U.S. 540, 555 (1994)).

Armatullo suggests that Justice Berkman was influenced by extrajudicial sources, declaring that her "very negative view . . . must have been formed apart from the various proceedings and case-related documents, evincing a personal bias which was attained from extrajudicial sources."  Judicial Bias Br. at 4 (emphasis in original); accord Pet. Mem. at 30.  As proof of his claim, Armatullo notes that after he objected to Vasquez's request for a sidebar based upon his right to hear whatever was said in the courtroom, the judge responded, "Whatever is said in this courtroom, sure."  Pet. Mem. at 30; see Feb. 7, 2001 Hearing: Tr. 2.  From this, Armatullo infers that Judge Berkman had been meeting with the attorneys outside of the courtroom, creating extrajudicial bias.  See Pet. Mem. at 30.  A meeting with the attorneys on the case that happens not to occur in open court, however, can hardly qualify as an extrajudicial source of bias.  In any event, while the record reflects that Justice Berkman repeatedly articulated her frustration with Armatullo – calling him "rather a difficult person," (Mar. 28, 2001 Hearing: Tr. 20), and

"manipulative," (July 17, 2001 Hearing: Tr. 10), for example – there is no basis on which to find that Justice Berkman formulated feelings about Armatullo based on anything other than what she learned as part of the case.

Furthermore, while Justice Berkman expressed great impatience with Armatullo, it cannot be said that she exhibited "a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555. In fact, Liteky specifically notes that there may be "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what [judges] sometimes display. A judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune." Id. at 555-56.

Finally, to the extent that Armatullo challenges Justice Berkman's impartiality because she denied many of his motions, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Id. at 555 (citing United States v. Grinnell Corp., 384 U.S. 563, 583 (1966)); accord Francolino v. Kuhlman, 224 F. Supp. 2d 615, 641 (S.D.N.Y. 2002). Nor is this one of those cases in which a judicial ruling could reasonably form the basis for a judicial bias claim.

In sum, Justice Berkman's "judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable)" were not based upon information acquired outside of the course of judicial proceedings and did not "display[] deep-seated and unequivocal antagonism." Liteky, 510 U.S. at 556.

36

F.  Prosecutorial Misconduct

Armatullo claims that the prosecutor knowingly used perjured testimony at trial, made a "deceitful representation" to the grand jury, and failed to turn over Brady material.  See Prosecutorial Misconduct Br. at 3-5.  None of the facts cited in his brief are new – only the legal theory presented to obtain habeas relief.  Armatullo acknowledges he did not present his prosecutorial misconduct claim to the state courts, but argues that the exhaustion requirement should be excused because of his "actual innocence."  Id. at 1, 6.

Armatullo's failure to raise these claims in the Appellate Division is fatal to their presentation here.  As Armatullo himself acknowledges, the facts underlying his prosecutorial misconduct claim are largely the same facts underlying the claims he raised before the Appellate Division, see id. at 3, all of which are based on a record which was available to him then.  He has shown no cause for his failure to raise them.  Nor has he provided any evidence of actual innocence.  Accordingly, the prosecutorial misconduct claim cannot be reviewed on the merits.  Bossett, 41 F.3d at 828-29.

G.  Requests for Discovery and an Evidentiary Hearing

Armatullo has requested that the Court order the depositions of: (1) his trial attorneys, Vasquez and Collins; (2) the prosecutor; (3) ADA Antonia Merzon, who initially represented the prosecution; (4) Donald Siewert, who handled the case for the prosecution on appeal, and (5) Justice Berkman.  Discovery Pet. ¶¶ 1-2, 5-6, 8.  Armatullo also requests a number of documents, including all the communications between the trial prosecutor and Siewert concerning his case on appeal, the grand jury testimony of Juan Beltran, a "Fact Write-Up" that Armatullo characterizes

as a "Rosario/Brady document" which allegedly was given to Vasquez, and the affidavit of the "E.M.T. record clerk."  Id. ¶¶ 4, 7.  Armatullo argues that this material would be relevant to his claims of ineffective assistance of counsel, unlawful amendment of the indictment, and judicial bias.  Id. ¶¶ 3, 5-6, 11, 14.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course," but may be permitted discovery upon a showing of good cause.  Bracy, 520 U.S. at 904; accord Drake v. Portuondo, 321 F.3d 338, 345-46 (2d Cir. 2003).  A petitioner can meet the "good cause" standard "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'"  Bracy, 520 U.S. at 908-09 (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)) (alteration in original); accord Wallace v. Ward, 191 F.3d 1235, 1245 (10th Cir. 1999), cert. denied, 530 U.S. 1216 (2000); Quesinberry v. Taylor, 162 F.3d 273, 279 (4th Cir. 1998), cert. denied, 526 U.S. 1013 (1999); Defino v. Thomas, 2003 WL 40502, at *4 (S.D.N.Y. Jan. 2, 2003).  "[W]here the petitioner provide[s] no specific evidence that the requested material would support his or her habeas corpus petition," however, the Court may exercise its discretion to deny a discovery request.  Gonzalez v. Bennett, 2001 WL 1537553, at *4 (S.D.N.Y. Nov. 30, 2001) (citing Charles v. Artuz, 21 F. Supp. 2d 168, 170 (E.D.N.Y. 1988)); accord Hirschfeld v. Comm'r of Div. of Parole, 215 F.R.D. 464, 465 (S.D.N.Y. 2003).

Armatullo has provided no such "specific" allegations.  Rather, he asserts conclusorily that the testimony of his trial attorneys, several attorneys in the District Attorney's Office, and Justice Berkman, along with various documents, would assist him in proving his claims.  Discovery Pet. ¶¶ 3-15; Discovery Mem. at 1-4.  These assertions do not support a finding of "good cause" to

grant his requests.  See, e.g., Renis v. Thomas, 2003 WL 22358799, at *1 (S.D.N.Y. Oct. 16,

2003) ("Generalized statements regarding the possibility of the existence of discoverable material

cannot yield 'good cause.'") (citing Gonzalez, 2001 WL 1537553, at *4); accord Munoz v. Keane,

777 F. Supp. 282, 287 (S.D.N.Y. 1991), aff'd, 964 F.2d 1295 (2d Cir. 1992).  As already

discussed, the record presently before the Court shows no merit to any of Armatullo's claims.

Armatullo's personal belief that further discovery will yield evidence helpful to him is not enough

to establish "good cause" for granting his requests.  See Quinones v. Miller, 2005 WL 730171, at

*5 n.5 (S.D.N.Y. Mar. 31, 2005) ("Petitioner's subjective belief that this evidence will establish

an actual conflict of interest is speculative and does not constitute 'good cause' for ordering

discovery.") (citing Bracy, 520 U.S. at 908-09).

Because Armatullo's request for additional discovery is denied and he offers no other

evidence in support of his claims, his request for an evidentiary hearing must also be denied.

H.  Claims under 42 U.S.C. §§ 1983 and 1985

Armatullo claims that he has been the victim of a conspiracy to deprive him of his civil

rights.  Specifically, he claims that the order to undergo a psychiatric evaluation "was a ruse

designed to prevent [his] self-representation" and violated his right to refuse the assistance of

counsel.  See 1983 Br. at 4.  Armatullo also argues that his defense counsel and Justice Berkman

"combined to obscure" his requests to examine the screwdriver and tack claw for blood, depriving

him of the right to assistance of counsel, due process, and equal protection.  Id. at 5-6.  Finally, he

claims that the prosecutor and defense counsel acted together to introduce perjured testimony at

trial.  Id. at 6-7.

Armatullo appears to present his section 1983 and 1985 claims as an additional basis for relief from conviction inasmuch as he does not seek damages and requests that the claims be reviewed in light of his previous filings. See id. at 8.

Where a prisoner is challenging the constitutionality of the fact or duration of his confinement, habeas corpus is the sole relief available. See Preiser v. Rodriguez, 411 U.S. 475, 489-90 (1973); accord id. at 490 ("[H]abeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, . . . [and] that specific determination must override the general terms of § 1983."); Nelson v. Campbell, 541 U.S. 637, 643 (2004) ("Despite its literal applicability, . . . § 1983 must yield to the more specific federal habeas statute, with its attendant procedural and exhaustion requirements, where an inmate seeks injunctive relief challenging the fact of his conviction or the duration of his sentence.") (citation omitted).

Accordingly, to the extent that Armatullo invokes sections 1983 and 1985 to vacate his judgment of conviction, any such claims must be dismissed. See, e.g., Channer v. Mitchell, 43 F.3d 786, 787 (2d Cir. 1994) (per curiam) (claim that police officers committed perjury at trial dismissed as claim properly brought under habeas corpus); Davis v. State of N.Y., 1991 WL 156351, at *7 (S.D.N.Y. Aug. 6, 1991) (portion of complaint challenging conviction based on violations of Sixth Amendment not cognizable in § 1983 action), aff'd, 106 Fed. Appx. 82 (2d Cir. 2004); Washington v. Sheinberg, 715 F. Supp. 1198, 1200 (E.D.N.Y. 1989) (ineffective assistance of counsel and denial of fair trial claims improperly brought under § 1983).

## CONCLUSION

For the foregoing reasons, Armatullo's petition should be denied.

## Notice of Procedure for Filing of Objections to this Report and Recommendation

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with an extra copy delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, New York, New York 10007.  Any requests for an extension of time to file objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140, 155 (1985).

Dated:  September 28, 2005
      New York, New York

                              _____
                              GABRIEL W. GORENSTEIN
                              United States Magistrate Judge

Copies sent to:

Anthony Armatullo
a.k.a. Anthony Cusamano, No. 04-R-1255
Clinton Correctional Facility
Inmate Mail
P.O. Box 2001
Dannemora, New York 12929

Megan P. Davis
Assistant District Attorney
District Attorney's Office
One Hogan Place
New York, NY 10013

Hon. Jed S. Rakoff
United States District Judge

## Notice of Procedure for Filing of Objections to this Report and Recommendation

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. See also Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with an extra copy delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time to file objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140, 155 (1985).

Dated: September 28, 2005
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Anthony Armatullo
a.k.a. Anthony Cusamano, No. 04-R-1255
Clinton Correctional Facility
Inmate Mail
P.O. Box 2001
Dannemora, New York 12929

Megan P. Davis
Assistant District Attorney
District Attorney's Office
One Hogan Place
New York, NY 10013

Hon. Jed S. Rakoff
United States District Judge

41